Argued March 14; affirmed March 21, 1939

# TREMBLAY *v.* FOULKES ET AL.

(88 P. (2d) 318)

Department 1.

*Stanley J. Mitchell*, of Oregon City (Vinton, Marsh & Marsh, of McMinnville, on the brief), for appellant.

*B. A. Kliks*, of McMinnville (Dorothy L. Kliks and Walter P. Gerber, both of McMinnville, on the brief), for respondent.

KELLY, J. There are but five questions involved in this appeal.

(1) Does the absence of an allegation in the complaint, that defendants were copartners prevent proof of defendant Eberly's liability for the price of the logs in suit?

(2) Should the trial court have instructed the jury that defendant Eberly could not be held liable upon the ground that he and his codefendant were partners; and that as a matter of law the evidence herein shows that no partnership existed between defendants?

(3) Was reversible error committed in overruling defendants' objection to the following question propounded to Mr. John Reed, "Just state the dealings you had with them." [Defendants].

(4) Does the testimony given by plaintiff on cross-examination, tending to show that he was acting merely as a broker in securing the logs in suit and in selling and delivering them disclose that plaintiff is not entitled to maintain this action?

(5) Should this appeal be held to be frivolous?

At the inception of his testimony, plaintiff testified in effect that he had resided in Willamina, Oregon, since May, 1937, had been engaged in the lumber business for about thirty-seven years; that the first word he received about the deal in suit was to the effect that defendants were looking for logs for a mill that they were operating in Sheridan; that he went to Sheridan, met defendant Foulkes, looked the place over; went over to Oregon City, met defendant Eberly, told Eberly of his meeting Foulkes, and Eberly confirmed the report that they wanted logs for the mill.

Upon being asked what was said between defendant Eberly and plaintiff, plaintiff answered:

"Well, I asked him about the price and the price of eight dollars was all right, and about how they paid and he explained to me that the logs would be delivered to the mill in Sheridan and would be scaled there by a scaler that they employed and a double slip of every load would be given to the truth [truck]. Then twice a month, the end of the 15th day and the end of the last day, we would get together with the men at the mill and total the slips, the footage of the slips, and they would issue a statement from the mill, and he in turn would accept that statement for payment. The payment was to be made twice a month for the logs that were delivered up to the 15th of the month. The payment

would be on the 25th. And for the logs delivered to the last—from the 15th to the last of the month, the payment would be on the 10th of the following month. We had quite a conversation there. He was quite enthusiastic about the business and we discussed this man Foulkes." * * *.

After recounting the alleged conversation between defendant Eberly and plaintiff with regard to a financial statement, plaintiff further testified that he told Eberly that, if his standing was half as good as the statement indicated, it would be a very good place to sell logs because they had to have money to pay the men.

We quote further from plaintiff's testimony as to what was said between plaintiff and defendant Eberly:

"A. Well, I asked him first if he was down to what we called the Calligan camp to see about logs, and he said he was down there with Mr. Foulkes, and he explained that Foulkes was the man in the mill, but that he was the financial man; that he handled the money and he bought the stuff and paid the bills; and that of course, was what we had to have, because there was no responsibility connected with this man Foulkes. After quite a friendly discussion there, I left and the logs started going into the mill." * * *.

Plaintiff's testimony, as above quoted, was contradicted by defendant Eberly.

■ Whether a partnership existed or not, this testimony and defendants' contradiction thereof presented a question for the jury upon the issue of defendant Eberly himself purchasing the logs in suit and agreeing to pay for them.

■ As to the absence from the complaint of an allegation to the effect that defendants were copartners, we think that a prima facie case against defendant Eberly

was made to the effect that Eberly, himself, contracted with plaintiff to buy the logs in suit, agreed upon the price claimed by plaintiff, and the time and manner of the payment, made one payment and was fully apprised of the delivery of said logs in accordance with the directions that he, Eberly, gave plaintiff when the contract of purchase was made. In the light of this prima facie showing, the question whether appealing defendant was a partner of his codefendant, engaged in a joint enterprise with him or was in fact acting entirely on his own account, would not in either case relieve Eberly of liability herein. In other words, the right to recover from defendant Eberly does not depend upon the existence of a partnership. For this reason, we hold that the absence of the allegation of partnership has no effect upon plaintiff's cause of action against defendant Eberly.

The doctrine of *Clark v. Wick*, 25 Or. 446, 36 P. 165, cited by defendant, is that, where an obligation is made payable to a partnership in its firm name, it is necessary to allege the partnership that plaintiffs compose the firm and that the contract was made by them in that name.

*Redemeyer v. Henley*, 107 Cal. 175, 40 P. 230, also cited by defendant, holds that an allegation of partnership on the part of several defendants is a sufficient allegation that one of the defendants was authorized to execute a promissory note rendering the members of the firm liable thereon.

*Stone v. Neeley*, 42 Neb. 567, 60 N. W. 965, also cited by defendant, holds that to render a defendant liable for the acts of his partner, the partnership should be alleged.

*VanBrunt & Davis Co. v. Harrigan*, 8 S. D. 96, 65 N. W. 421, holds that it is not necessary that defendants be described in the title as partners.

■ Upon the subject of partnership, besides the foregoing testimony, there is a document which tends to disclose that such a relationship existed. Plaintiff's exhibit No. 11, which is an agreement partly typewritten and partly written with pen and ink, contains various provisions concerning the operation of the mill at Sheridan, Oregon; provides for payment of one-half of the net proceeds to Eberly for his services; that the salary and operating expenses for Foulkes are to be agreed upon, and that division of the net profits are to be made quarterly. The phrase concerning the quarterly division of net profits was written by defendant Eberly. The terms of this exhibit, in the light of the foregoing testimony by plaintiff, render inapplicable the requested instruction to the effect that the evidence shows that there was no partnership between defendants. Defendant's testimony to the effect that there was no partnership could be given no stronger legal effect than to put the question in issue.

■ As to the testimony of Mr. Reed, objection, on the ground that it was an attempt to prove partnership, was made to the following question propounded to him: "Just state the dealings you had with them?" [Referring to defendants herein.] Said objection being overruled, the question was repeated in the following form, "Just state what dealings you had with Mr. Foulkes and Mr. Eberly then?" And Mr. Reed partially answered this question by saying: "Mr. Foulkes came up to our place where we were logging one Sunday and he said they were starting"—At this point he was interrupted by a further objection on the ground that

the statement was not made in Mr. Eberly's presence, and the objection was sustained. No other objection was made to any of Mr. Reed's testimony. In this state of the record, no question is presented for determination because of the above quoted question propounded to witness Reed.

The character of plaintiff's testimony in regard to whether he was the real party in interest is best presented by quoting that part of it. We begin with the quotation from the cross-examination of plaintiff:

"Q Now where do these logs you have been talking about, where did they come from?
A They came from Ivan Calligan.
  *  *  *  *  *

Q Who owned the land?
A I don't know who. I don't recall the name of the man who owned the land but the stumpage was contracted from Shank, Wesley Shank.
  *  *  *  *  *

Q And did you buy these—the stumpage from Shank?
A No. Calligan bought the stumpage from Shank and I was to hold the money out of the payments and pay Shank one dollar and a half a thousand for Calligan.

Q And you were buying the logs from Calligan?
A Yes.
  *  *  *  *  *

Q And what was your part in that?
A My part was keeping the accounts and doing the selling and proportioning the money to the various places that it would go, but I bought the logs from Calligan, but when I paid them out I paid money to different places.

Q Were you a partner of Calligan?
A No.
Q Well, I don't know that—I got this just clear yet. Were you buying those logs from Calligan?
A I had the first call on the logs, yes.

Q Did you buy them from Calligan

A Yes, I bought a large part of them. He sold logs other places.

Q What?

A He sold logs other places.

Q And you bought them from Calligan and then he delivered them?

A Yes.

\* \* \* \* \*

Q Well did you go down there to Oregon City for Calligan or for yourself?

A Well, both. I got a commission for handling the sales part.

Q You got a commission for handling these logs then?

A Yes.

Q In other words, you didn't own these logs, did you?

A Yes, I think I did.

Q Well, now, thinking and knowing, that is the question. You say you were getting a commission to sell those logs for Calligan. What is the fact about it. If you were getting a commission, he owned the logs, didn't he?

A No, I had the stumpage.

Q Well, I thought you said Calligan paid Shank for the stumpage?

A No, I told you I paid Shank for the stumpage.

Q You just testified here awhile ago, as I understand it, that Calligan paid Shank for the stumpage.

A No, I don't think so. That is not the way of it. I paid Shank for the stumpage.

Q Now, which way do you want it? Did you pay the stumpage or was Calligan to pay the stumpage?

A I paid the stumpage.

Q And it was paid?

A No—

\* \* \* \* \*

Q How much commission were you to get to sell these logs?

A Thirty-seven and a half cents a thousand.

Q And that was your commission out of the logs?
A Yes.

Q And Calligan was to do the logging and put them in the mill?

A Yes.

Q And he was to get the balance, or he was to get the eight dollars a thousand?

A Yes.

Q And he was to give you thirty-seven and a half cents commission out of that eight dollars?
A Yes.

Q And out of the thirty-seven and half cents a thousand you were to pay stumpage?

A No. No, I held the stumpage out on an order from Wesley Shank out of the money that Calligan got for the logs.

Q In other words, the dollar and a half a thousand came out of the eight dollars Calligan was to get.
A Oh, yes.

Q So it was Calligan's bill that was paying—he was paying the stumpage, wasn't he? And all you were getting was the thirty-seven and a half cents a thousand?

A Yes.''

Following the foregoing testimony of plaintiff, a motion for involuntary nonsuit was interposed by defendant. Thereafter, the noon recess was taken by the court. Following the recess, the motion for nonsuit was overruled. Thereupon, the examination of plaintiff, as a witness, in his own behalf was resumed.

Upon redirect examination, the following occurred:

"Q Now, in your statement there in the first place, as to the logs, you made one statement there and then

made some explanation about a thirty-seven and a half cents or something of that kind.

A Well,—

Mr. Marsh: Just a minute, Your Honor please. I am going to object to that question because that isn't what he stated. If he wants to state what he really said, he said a thirty-seven and a half cent commission per thousand feet, so in fairness to the witness, I think he should ask him the particulars about that.

Q Well, whatever it was, whether it was 37½c per thousand feet or whatever it was, what have you to say on that?

A Well, that isn't just exactly the way it was.

Mr. Marsh: Just a minute, Your Honor please, I am going to object to that question; what has he got to say about it. He has had his say. If there is any particular redirect examination counsel wants to make, I am going to ask that he ask a direct question about it. Not what he is going to say about it. He has had his say about it. This just is turning the witness loose. I object to that.

Mr. Kliks: I am directing his attention to that phase of it and just what that was. I didn't quite catch whether it was 37½c per thousand, or whether it was that one item or the other.

The Court: 37½c per thousand commission, he said.

Q Well, I want him to explain what, if any, interest he had.

The Court: Go ahead. I think you should ask him a definite question.

Q Go ahead and explain what interest, if any, it was; whether you were just a commission man in there, or whether they were your logs, or otherwise.

Mr. Marsh: I object to that. He asked about three questions in there and he is trying to get the witness out of a hole he is in, because he admitted that all the interest he had was a thirty-seven and a half cents commission. Now, that is definite and there is no explanation, unless there is some that can be brought out on a direct question.

The Court: I think I will let the witness explain.

A Calligan first started to log down there. I took all the logs and took them into my mill. As it went on, the logs got too big for my mill.

Mr. Marsh: Just a minute, Your Honor. I object to that. We are not talking about any other logs.

The Court: Yes, these particular logs.

A Well, they were just a continuation of the logging and they were too big and they had to dispose of them.

Mr. Marsh: Well, just a minute, you heard the court rule. If the court please, I don't like to be considered abusive toward the witness, but I think he should be instructed to answer the question.

The Court: Yes, about these particular logs.

A Well, I bought them for seven dollars a thousand, the same as I had been doing all the way through. I bought them for seven dollars a thousand, the same as I had been doing, off the claim, and the logs were taken up to Sheridan. Calligan didn't like to sell them. He didn't like the outfit and wasn't in the selling business, and he said if I wanted to go ahead and take the chance, to go ahead and sell them. There was a little more cartage to pay and one thing and another, and got a little more money out of it, and it made a little profit and it let them work; and that is the whole thing.

Q Who was making the profit?

A I was.

Q As a matter of fact then, you got 37½c on the seven dollars, is that the idea?

A Yes.

Mr. Marsh: Just a minute now, I am going to object to that; that is a leading question, and let the witness tell it.

Go ahead and explain it.

A Well, it didn't work out 37½c exactly, but that was the customary commission and that is what I figured was an arbitrary commission.

Q  Then what else?

A  I told Calligan there would be some extra cartage and we didn't think it would amount to much, but there was some which would have to be paid for, and then there was that dollar, and extra cartage would come out of that. The difference between the haul to Willamina and the haul to Sheridan.

Q  Now, did Calligan have any interest in those logs?

A  Well, I guess not.

Q  Well, guess not. What do you know?

A  No, he didn't.

Q  Well, did any one else have any interest in them?

A  Except the man that got the stumpage from.  I have to pay the stumpage for that."

 *       *       *       *       *

After a somewhat extended recross-examination, defendants' attorney asked plaintiff:

"Q  One more question about this.  Do you want this jury and judge to understand now that you weren't to get thirty-seven and a half cents per thousand as commission?

A  Yes.

Q  You want them to understand that?

A  Yes I want them to understand that."

Mr. Ivan Calligan testifying as a witness in behalf of plaintiff made answers to the following questions thus:

"Q  Now, these logs—to whom did you sell those logs that you logged up there?

A  I sold most of them to Tremblay.  I sold him a lot at the start.

Q  You sold them to Tremblay.

A  Yes, sir.

Q  And were those the logs that you finally delivered to Mr. Eberly and Mr. Foulkes?

A  Yes, sir."

■■ As to the question involved in plaintiff's testimony tending to show that he was merely a broker, and, therefore, not the real party in interest, we think that there are two reasons why appealing defendant's position cannot be upheld, (1) the defense that an action is not brought in the name of the real party in interest is proper only where it is alleged and shown that the defendant is cut off from any just offset or counterclaim and it appears that the defendant will not be fully protected by a judgment in favor of the party suing when the same is satisfied: *Lentz v. Oregon Growers Co-op Assn.* 116 Or. 683, 691, 242 P. 826, and authorities there cited; (2) there is direct testimony to the effect that plaintiff was himself the owner of the logs in suit. His inconsistent testimony on that point was a matter for the trial jury to evaluate. This direct testimony was given not only by plaintiff but also by Mr. Calligan for whom defendant claims plaintiff was a mere selling broker.

*Skelton v. Schacht Motor Car. Co.*, 22 Cal. App. 144, 133 P. 504, cited by defendant, is a case where plaintiff admitted executing an agreement in writing which, the court held, had the effect of fully adjusting all matters in controversy between the parties.

*Steele v. Kansas City Southern Ry. Co.*, 265 Mo. 97, 175 S. W. 177, also cited by defendant, is readily distinguishable from the case at bar. In that case, the testimony first given by plaintiff was such as to prevent any recovery. The practice in that jurisdiction permits the trial court to grant a new trial, where by verdict the party holding the affirmative prevails, if the testimony does not preponderate in favor of such party. In the Steele-Railway case, the only testimony on the point at issue was that of plaintiff.

Moreover, in a later case, the supreme court of Missouri makes this observation:

"It is true that frequently on cross-examination the testimony of a witness would be explained, and perhaps the positiveness of his statement on direct somewhat shaken, but this is usual; and unless there is testimony on cross-examination tantamount to a retraction, the testimony on direct stands and the duty rests with the jury to determine just what the witness's evidence has been." *Biondi v. Central Coal & Coke Co.* 320 Mo. 1130, 1135, 9 S. W. (2d) 596.

*Evans v. Josephine Mills,* 119 Ga. 448, 46 S. E. 674, also cited by defendant, affirms the doctrine that in a personal injury action even though the plaintiff proves every fact charged in the complaint, if on cross-examination or otherwise, he disproves his right to recover by establishing the existence of other undisputed defensive facts, which show that he is not entitled to a verdict, a nonsuit should be granted. In the case at bar, the fact relied on for nonsuit is that plaintiff was merely the selling broker of Calligan. As shown, this is emphatically disputed by plaintiff and refuted by Calligan.

*Smith-Webster Co. v. John et al.,* 259 Fed. 549, also cited by defendant, is one wherein the court held that in his own right a mere selling broker has no right to sue for the purchase price. There were three causes of action based upon a like number of contracts. The court also held that the real plaintiffs were the individuals for whom the plaintiff of record acted as a selling broker and that inasmuch as none of these three claims was sufficient in amount to meet the jurisdictional requirement of the federal court, the three could not be united to create a case for federal jurisdiction.

The questions decided in this federal case are not present in the instant case.

*Lawyer v. Post*, 109 Fed. 512, also cited by defendant, holds that a real estate agent, who has secured an option to buy real property at the request of a third person under an agreement that in the event of the consummation of the negotiations he should receive a commission of five per centum of the purchase price, cannot maintain a suit for specific enforcement of such option by requiring defendants to execute a deed conveying said real property to said third person. It is not a case involving an attempt to recover the purchase price of property sold and delivered.

The judgment of the circuit court should be affirmed.

■ As to the question whether terms should be imposed on the ground that this is a frivolous appeal, we think that we are not justified in taking such a course.

Affirmed.

RAND, C. J., and BELT and ROSSMAN, JJ., concur.